IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRINITY INDUSTRIES, INC. and )
TRINITY INDUSTRIES RAILCAR )
CORPORATION, )
              Plaintiffs, )
                          )
     v.                   ) Civil Action No. 08-1709
                          )
CHICAGO BRIDGE AND IRON   )
COMPANY,                  )
              Defendant.  )

MEMORANDUM

Gary L. Lancaster,                          April 4, 2012
Chief Judge.

This is an environmental law action. Plaintiffs, Trinity
Industries, Inc. and Trinity Industries Railcar Corporation
(collectively, "Trinity") bring federal claims under the
Comprehensive Environmental Response, Compensation and Liability
Act ("CERCLA"), 42 U.S.C. § 9601, et seq., and the Resource
Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq.[1]
Trinity also brings state claims under Pennsylvania's Hazardous
Sites Cleanup Act ("HSCA"), 35 PA.CONS.STAT. § 6020.101, et seq.,
and various common law and contract theories. Trinity alleges
that it is entitled to injunctive and monetary relief from
Chicago Bridge and Iron Company ("CBI") for the remediation of
an industrial site, which Trinity is undertaking pursuant to a

---

[1] The court will refer to the relevant provisions of these
statutes by their statutory section number, rather than their
United States Code section number.

court order. CBI asserts a counterclaim against Trinity for contribution under CERCLA section 113(f)(1).

This matter is before the court on Trinity's motion for partial summary judgment [Doc. No. 54] and CBI's motion for summary judgment [Doc. No. 56]. Trinity moves for summary judgment of its federal claims under CERCLA and RCRA, its state claims under HSCA, and its indemnification and breach of contract claims. CBI moves for summary judgment on all Trinity's claims.[2]

For the following reasons, Trinity's motion for partial summary judgment will be denied and CBI's motion for summary judgment will be granted, without prejudice to Trinity's right to reassert its state law claims in state court.

I.   FACTUAL BACKGROUND

Unless otherwise indicated, the following material facts are undisputed. Additional material facts may be discussed elsewhere in this memorandum, in context.

At various times, Trinity and CBI owned, and conducted industrial activity on, an approximately 53 acre site in Greenville, Pennsylvania (the "Site"). CBI owned the Site from around 1911 to 1985. In 1985, CBI sold the Site to MBM Realty Associates ("MBM"). MBM sold the Site to Trinity in 1988.

---

[2] Trinity does not move for summary judgment of CBI's counterclaim, but that claim is now moot.

2

Trinity has continuously owned the Site from 1988 to the present.

A. History of the Site

In or about 1911, CBI began fabricating steel products on the Site. These steel products included storage tanks, pressure vessels, conical structures for U.S. Navy submarines, water towers, and bridge components. CBI engaged in various industrial processes in connection with manufacturing these products, including sand blasting and painting. The parties dispute facts relating to the specific processes and handling of the waste products generated by these processes. CBI ceased its manufacturing operations on the Site in 1982.

In 1985, CBI sold the Site to MBM. As part of the sale, CBI and MBM entered into an indemnification agreement (the "Agreement"). The Agreement reads, in pertinent part:

> CBI hereby agrees to indemnify and hold harmless MBM from any and all claims, costs, liabilities, fines, penalties, and damages of any kind whatsoever in connection with violations or claimed violations of either Federal or Pennsylvania state law in connection with storage, use, disposal, discarding or removal of any hazardous, toxic or other environmentally sensitive materials or waste products, generated or used in connection with the operation of [the fabrication plant located on the Site]. . . . This indemnity shall relate only to claims or damages arising on account of actions of CBI[.] The indemnity herein . . . shall inure to the benefit of any and all successors and assigns of MBM.

During its ownership, MBM leased the Site to Quality Steel Fabricators, Inc. ("QSF") and Sha Co Welding & Fabrication ("Sha

3

Co"). QSF operated a steel fabrication job shop on the Site from mid-1985 through late 1989. Sha Co manufactured steel dumpsters and steel safety bottle racks on the Site from mid-1987 through mid-1989.

Trinity purchased the Site from MBM in November 1988. As part of this sale, MBM assigned to Trinity the Agreement, transferring MBM's "right, title and interest in and to the Indemnification Agreement" to Trinity.

From approximately 1988 to 2000, Trinity operated a railcar manufacturing facility on the Site. The Trinity railcars manufactured at the Site were made primarily of steel. Trinity used various products, including paint, in its railcar manufacturing processes. Trinity acknowledges that paint spills sometimes occurred, but disputes the existence of evidence connecting paint spills or use of other products in its manufacturing processes to contamination at the Site.

B. Criminal Charges and Consent Order

In June 2004, the Environmental Crimes Section of the Bureau of Criminal Investigation of the Pennsylvania Office of the Attorney General began investigating Trinity for violations of state environmental laws in connection with Trinity's railcar manufacturing operations. This investigation involved interviews of former Trinity employees and soil testing at the Site.

On March 31, 2006, as a result of the investigation, the Commonwealth of Pennsylvania filed criminal and civil charges against Trinity. The Commonwealth's criminal complaint contained eleven counts against Trinity, including felony and misdemeanor counts for unlawful storage, transport, and disposal of hazardous waste. On October 31, 2006, Trinity pleaded nolo contendre to five misdemeanor counts of unlawful conduct.

On December 21, 2006, Trinity entered into a Consent Order and Agreement (the "Consent Order") with the Pennsylvania Department of Environmental Protection ("PADEP").[3] That same day, the Court of Common Pleas of Mercer County, Pennsylvania ordered Trinity to remediate all environmental contamination at the Site in accordance with the Consent Order.

The Consent Order contains a series of findings, admitted by Trinity, including the following: "[PADEP] has obtained information that hazardous substances are located at the [Site] and that a 'release' and 'threatened release' of 'hazardous substances,' within the meaning of those terms under Section 103 of HSCA, 35 P.S. §6020.103, occurred at the [Site]. The hazardous substances include, without limitation, inter alia, xylenes, naphthalene, and 1,2,4-trimethylbenzene." PADEP also found that Trinity is a "responsible person" under HSCA for the

---

[3] In addition to the Site, the Consent Order requires that Trinity remediate an adjacent site, referred to as the North Plant.

5

release or threatened release of hazardous substances at the Site.

The Consent Order imposes a remediation process closely supervised by PADEP. It provides that "Trinity shall obtain prior approval from [PADEP] and conduct the Response Actions in accordance with the [PADEP]-approved schedule to fully investigate and respond to the release of hazardous substances at the [Site.]" The cleanup standards for the Site are to be "selected by Trinity" and approved by PADEP pursuant to Chapter 3 of Pennsylvania's Land Recycling and Environmental Remediation Standards Act, 35 PA. CONS. STAT. §§ 6026.302-6026.303.

In order to comply with its cleanup requirements, Trinity was required to submit to PADEP a proposed Investigation Work Plan, a proposed Supplemental Investigation Work Plan, and a Notice of Intent to Remediate. Trinity was also required to submit a Remedial Investigation Report and Cleanup Work Plan. According to the Consent Order, "[t]he terms of the Cleanup Work Plan shall be selected by Trinity and subject to approval by [PADEP]. Upon approval . . . Trinity shall begin and complete the approved Response Actions at [the Site] in accordance with the approved schedule." The Consent Order defines "Response Actions" as follows: "any and all of the actions taken or to be taken by [PADEP], Trinity, and/or any other responsible persons under the direction of [PADEP], relating to and addressing the

6

release and threatened release of any hazardous substances at the [Site.]" The Consent Order provides for additional steps culminating in a PADEP approved Final Report.

Pursuant to the terms of the Consent Order, Trinity retained Golder Associates Inc. ("Golder") to perform a remedial investigation of the Site. Golder submitted a Remedial Investigation Report ("RI Report") to PADEP on March 1, 2010, and the RI Report was approved by PADEP on March 31, 2010. Golder submitted a Cleanup Work Plan on March 25, 2011.

## C. Current Condition of the Site

According to the Cleanup Work Plan, there are four potential pathways for exposure to contaminants at the Site: (1) human ingestion or uptake of manganese-impacted groundwater; (2) exposure of Site workers or Site trespassers to lead-impacted soil; (3) exposure of Site workers to volatile organic compound vapors at the Site; and (4) exposure of humans, flora and fauna to lead-impacted surface water and sediments.

According to the RI Report, "[t]he dominant [constituents of concern] at the Site, in terms of concentration and extent of exceedances, are lead in soil and manganese in groundwater." [Doc. No. 60, Exh. 28, part A at 11.] The RI Report indicates that the groundwater manganese is naturally occurring. It attributes the lead in the soil to "former paint drying,

7

pickling, and sand blasting areas; former waste acid filter pond area; and fill areas." Id.

The parties dispute each other's characterizations of the observations and conclusions concerning the Site contained in the Remedial Investigation Report and the Cleanup Work Plan.

## II.  LEGAL AUTHORITY

The court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets its burden of proving that no genuine issue of material fact exists, then the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'".  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original).  When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) (citing cases).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue under the governing substantive law. See Anderson v. Liberty Lobby, 477 U.S. at 248-49. Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. United States Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 322-23.

In summary, the inquiry in ruling cn a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is such that the movant must prevail as a matter of law.

### III. DISCUSSION

#### A. CERCLA Claims

Trinity seeks recovery from CBI under CERCLA sections 107(a), 113(f)(1), and 113(f)(3)(B). CBI asserts a counterclaim against Trinity for contribution under section 113(f)(1).

"CERCLA provide[s] for a right to cost recovery in certain circumstances, § 107(a), and separate rights to contribution in other circumstances, §§ 113(f)(1), 113(f)(3)(B)." U.S. v. Atlantic Research Corp., 551 U.S. 128, 138 (2007) (internal quotation omitted). The remedies provided by sections 107(a) and 113(f) are "clearly distinct". Id.

##### a. Trinity's Cost Recovery Claim Under Section 107(a)

CERCLA section 107(a) provides a cause of action for potentially responsible parties ("PRPs"), like Trinity, to recover the "necessary costs of response" it has "incurred" in remediating a site from any person who owned or operated a facility at which hazardous substances were disposed. Agere Systems, Inc. v. Advanced Envtl. Tech. Corp., 602 F.3d 204, 225 (3d Cir. 2010). The necessary response costs incurred must be "consistent with the national contingency plan." Id.

Trinity argues that CBI, as a former owner and operator of the Site, is liable under section 107(a) for costs paid by Trinity in connection with the remediation process required by the Consent Order. CBI argues that Trinity cannot recover costs

10

under this section because, in remediating the Site pursuant to a court order rather than voluntarily, Trinity has not "incurred" costs, as required by the statute.

The scope of cost recovery claims under section 107(a), originally available only to "innocent" parties, was revisited by the United States Court of Appeals for the Third Circuit after Atlantic Research.  E.I. Dupont De Nemours & Co. Inc. v. U.S., 508 F.3d 126, 132 (3d Cir. 2007).  Section 107(a) actions are now also available to PRPs who have undertaken a site cleanup voluntarily.  Id. at 135 (recognizing "there is no doubt that, contrary to our precedents, a PRP may bring a cause of action for cost recovery under § 107").  The question remains whether a section 107(a) cost recovery claim is available to a broader group of PRPs.[4]  The issue presented by the facts of this case appears to be one of first impression:  whether a party conducting a site cleanup pursuant to both a state court order

---

[4] In Atlantic Research, the United States Supreme Court expressly left undecided the related question whether compelled costs of response pursuant to a consent decree resolving CERCLA liability were recoverable under section 107(a), 113(f), or both.  551 U.S. at 139, n.6.  The United States Court of Appeals for the Eighth Circuit later reached the question, holding that section 113(f) "provides the exclusive remedy for a liable party compelled to incur response costs pursuant to an administrative or judicially approved settlement under §§ 106 or 107." Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 603 (8th Cir. 2011).  Neither opinion, however, discusses the procedural circumstances of this case, and whether CERCLA liability may flow from a Consent Order resolving only state statutory liability.

11

and an administrative settlement with a state agency "incurs" the costs of remediation.

To resolve this question, we must look to the "plain language" of section 107(a) to determine whether it provides Trinity a cause of action in this procedural scenario. Id. (quoting Atlantic Research, 551 U.S. at 136). The portion of section 107(a) relevant here states that liability extends to "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

Based on the plain language of the statute, Trinity must have "incurred" costs of response in order to have a claim for recovery against CBI. The Supreme Court and United States Court of Appeals for the Third Circuit have each addressed the meaning of "incurred" in the section 107(a) context. The Supreme Court in Atlantic Research provided the following limitations to the meaning of the term: "When a party pays to satisfy . . . a court judgment, it does not incur its own costs of response. Rather, it reimburses other parties for costs that those parties incurred." Atlantic Research, 551 U.S. at 139.

In applying Atlantic Research to remediation payments pursuant to a private settlement, the court of appeals further illuminated the term's meaning: "We do not think the Supreme Court intended to deprive the word 'incurred' of its ordinary

meaning." Agere, 602 F.3d at 225. The court then described the "ordinary sense" of the term as owing payment on "a bill one obligates oneself to pay[.]" Id. (emphasis added). This understanding of the term indicates that voluntary acceptance of the obligation to pay is a necessary condition of "incurring" costs of cleanup.

Trinity has not incurred cleanup costs as that term has been interpreted in Atlantic Research and Agere. There can be no dispute that Trinity is not voluntarily undertaking action to remediate the Site. Trinity has not obligated itself to pay the costs of remediation. Indeed, Trinity is doing so pursuant to an order of the Court of Common Pleas of Mercer County and the Consent Order.

Accordingly, the court holds that CERCLA section 107(a) does not permit cost recovery actions by PRPs paying cleanup costs pursuant to a state court order. CBI's motion for summary judgment of Trinity's section 107(a) claim will be granted.

### b. Contribution Claims Under Sections 113(f)(1) and 113(f)(3)(B)

Trinity argues that it is entitled to contribution from CBI under CERCLA section 113(f)(1) or 113(f)(3)(B). CBI responds that this case does not meet the necessary conditions for contribution under either section. First, CBI argues section 113(f)(1) requires that Trinity be subject to liability under

13

CERCLA section 106 or 107(a). Second, CBI argues the Consent Order is not a judicial order or administrative settlement within the meaning of those terms in section 113(f)(3)(B) because it does not expressly resolve CERCLA liability.

CBI also brings a contribution counterclaim against Trinity under section 113(f)(1).

### i. Both Parties' Section 113(f)(1) Claims

"Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a)." Atlantic Research, 551 U.S. at 139. Trinity and CBI do not share common liability arising from a CERCLA action. Trinity, per the Consent Order, is liable only under Pennsylvania law. It is this liability – not liability under section 106 or 107(a) – that Trinity seeks to share with CBI through a section 113(f)(1) claim. Similarly, CBI's counterclaim under section 113(f)(1) fails because Trinity has no viable section 107(a) claim.

Accordingly, both parties claims under section 113(f)(1) will be dismissed.

### ii. Trinity's Section 113 (f)(3)(B) Claim

Trinity also argues that its cleanup costs are recoverable under section 113(f)(3)(B). Section 113(f)(3)(B) "permits a PRP to seek contribution after it 'has resolved its liability to the United States or a State . . . in an administrative or

14

judicially approved settlement[.]'" Atlantic Research, 551 U.S. at 138 n.5 (quoting 42 U.S.C. § 9613(f)(3)(B)). CBI contends that this section is inapplicable to Trinity's claims because the Consent Order does not resolve CERCLA liability.

We agree with CBI's argument that Trinity does not have a section 113(f)(3)(B) claim because the Consent Order does not resolve Trinity's CERCLA liability. In Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc., 423 F.3d 90 (2d Cir. 2005), the United States Court of Appeals for the Second Circuit, relying on the statute's text and legislative history, construed section 113(f)(3)(B) "to create a contribution right only when liability for CERCLA claims, rather than some broader category of legal claims, is resolved." Id. at 95-96. Accordingly, Trinity may only have a contribution claim against CBI under this section if the Consent Order resolves CERCLA liability.

Although the Consent Order is both an administrative and judicially approved settlement, it does not resolve Trinity's CERCLA liability. The Consent Order does not expressly or implicitly resolve Trinity's CERCLA liability. It therefore does not preclude the U.S. Environmental Protection Agency from taking action against Trinity under CERCLA. This case involves a state prosecution to enforce a state statute, culminating in a Consent Order that does not expressly address federal liability.

These unique procedural circumstances constrain the court to reject Trinity's federal cost recovery and contribution claims. But this conclusion is not inconsistent with CERCLA's primary purposes of encouraging timely cleanup of hazardous waste and placing the cost of cleanup on those responsible. See Agere, 602 F.3d at 226. First, the cleanup process is underway pursuant to state court and administrative orders. Second, to the extent Trinity can prove CBI is responsible for the hazardous conditions that led to Trinity's prosecution and the Consent Order, Trinity may still pursue cost recovery and contribution claims under HSCA in state court.

CBI's motion for summary judgment of Trinity's section 113(f)(3)(B) claim will be granted.

## B. RCRA Claim

Trinity asserts a claim against CBI under RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), which provides that a person may bring an action: "against any person . . . who has contributed . . . to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."   42 U.S.C. § 6972(a)(1)(B).

Both Trinity and CBI have moved for summary judgment of Trinity's RCRA claim. Although there are disputed issues of material fact regarding the existence of an imminent and

16

substantial danger at the Site, the court will grant summary judgment in favor of CBI because there is no meaningful relief available under RCRA in light of the Consent Order.

a. Liability

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC West., Inc., 516 U.S. 479, 483 (1996). In order to prevail under § 7002(a)(1)(B), a plaintiff must prove: (1) that defendant is a person who generated or transported solid or hazardous waste or who owned or operated a solid or hazardous waste treatment, storage, or disposal facility; (2) that defendant contributed to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment. Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 258 (3d Cir. 2005).

Both parties' arguments for summary judgment focus on the third element of the claim. Trinity argues that there is evidence in the record demonstrating both current and future danger caused by hazardous substances at the Site. CBI argues that there is no imminent and substantial endangerment because the record shows no present and continuing pathways for exposure. CBI argues that the evidence demonstrates only

"incomplete" or "potential" pathways giving rise to a "slight" chance of exposure. [Doc. No. 57 at 24.]

While the statute's use of the conditional "may" is in apparent tension with the requirement of "imminent" danger, RCRA has been interpreted to cover potential harm. The court of appeals in Interfaith clarified the meaning of this statutory language:

The operative word ... [is] "may"[.]

[P]laintiffs need only demonstrate that the waste ... "may present" an imminent and substantial threat.... Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm.... The endangerment must also be "imminent" [meaning] threatens to occur immediately.... Because the operative word is "may," however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm ... [as] an endangerment is substantial if it is "serious" ... to the environment or health.

399 F.3d at 258 (quoting Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1015 (11th Cir. 2004)). Accordingly, in order to prevail, Trinity must identify evidence showing that there is potential for an imminent threat of a serious harm.

The Site's Cleanup Work Plan identified four potential pathways for exposure: (1) human ingestion or uptake of manganese-impacted groundwater; (2) exposure of Site workers or Site trespassers to lead-impacted soil; (3) exposure of Site workers to volatile organic compound vapors at the Site; and (4)

exposure of humans, flora and fauna to lead-impacted surface water and sediments.

In Interfaith, the United States Court of Appeals for the Third Circuit determined that an implicit requirement of finding "imminent and substantial endangerment" is the existence of "a pathway for current and/or future exposure." 399 F.3d at 259. While the court of appeals observed that the district court found "present and continuing pathways for exposure" in that case, it did not require such a finding as a condition of finding imminent and substantial endangerment. See Interfaith, 399 F.3d at 261.

Here, the parties agree on the four potential pathways for exposure to Site contaminants identified in the Cleanup Work Plan. [Doc. 58 at ¶45.] CBI argues that these are merely "potential" pathways that would result in "slight" exposure. But describing the pathways as "potential pathways" is another way of saying that they are pathways for future exposure. RCRA provides a cause of action for sites that may in the future cause substantial and imminent danger.

Trinity has produced sufficient evidence to create a material issue of fact as to whether hazardous substances at the Site may present an imminent and substantial endangerment. The RI Report describes the "current potential for exposure" as "limited". [Doc. No. 60-44 at 2.] But a "limited" potential

exposure may be considered serious, and thus actionable under RCRA.

### b. Relief Available to Trinity

Having determined that there are disputed issues of fact as to whether the Site presents harm cognizable under RCRA, the court must decide whether there is injunctive relief available to Trinity. See 87th Street Owners Corp. v. Carnegie Hill 87th St. Corp., 251 F. Supp. 2d 1215 (S.D.N.Y. 2002). Because Trinity has been ordered to "remediate all environmental contamination at the [Site]", an injunction directing CBI to engage in the cleanup is not warranted.

Monetary compensation for cleanup efforts is not an available remedy under RCRA section 7002(a)(1)(B). The remedial scheme provides private citizens two types of injunctive relief: (1) a mandatory injunction, requiring a responsible party to take action by "attending to the cleanup and proper disposal of toxic waste"; or (2) a prohibitory injunction, restraining "a responsible party from further violating RCRA." Meghrig, 516 U.S. at 484. Because CBI no longer conducts activity at the Site, only a mandatory injunction would be possible.

A mandatory injunction, however, is not necessary where remedial action is already in place. In 87th St. Owners, the court concluded that it could not grant summary judgment on the question of liability under RCRA, but that any injunctive relief

20

it ordered would be superfluous because the New York State Department of Environmental Conservation already had a remediation program in place. 251 F. Supp. 2d at 1219-20. The court recognized that, although it had broad equitable powers under RCRA, the plaintiff's suit was truly about the parties' responsibility for paying the costs of remediation, which is beyond the scope of the court's RCRA jurisdiction. Id. at 1219, 1221. This conclusion is consistent with RCRA section 7002(a)'s intended purpose, as described by the Supreme Court in Meghrig, of ameliorating present risk or obviating future risk of imminent harms. 516 U.S. at 486.

This case is similarly about apportioning financial responsibility for remediation efforts, not enjoining and remediating an environmental danger. Trinity argues that a RCRA injunction ordering CBI to take action would be appropriate because the active cleanup of the Site has not begun. The remediation process, however, is well under way. The RI Report and Cleanup Work Plan for the Site are complete. Furthermore, the Consent Order directly addresses and orders remediation of the environmental danger posed by the Site. In other words, the relief that would be available to Trinity under RCRA has already been provided by the Consent Order, albeit by requiring Trinity to conduct the cleanup. Issuing a RCRA injunction to remediate

a site that is already subject to a court ordered remediation would serve no purpose.

Accordingly, the court will grant CBI's motion for summary judgment of Trinity's RCRA claim.

### C. State Law Claims

Having determined that CBI is entitled to summary judgment in its favor on Trinity's CERCLA and RCRA claims, the court must now address whether to retain supplemental jurisdiction over Trinity's state law claims [Doc. No. 45, Counts IV-X]. Because Trinity's claims under HSCA raise a complex issue of state law, and because no federal claims survive summary judgment, the court will decline to exercise jurisdiction over the remaining state law claims.

Under 28 U.S.C. § 1367(c), the district court has discretion to decline to exercise jurisdiction over a state claim if "the claim raises a novel or complex issue of State law . . . [or] the district court has dismissed all claims over which is has original jurisdiction." Combs v. Homer-Center Sch. Dist., 540 F.3d 231, 253 (3d Cir. 2008). "A decision to remand under section 1367 reflects the court's judgment . . . that at the present stage of litigation it would be best for supplemental jurisdiction to be declined so that state issues may be adjudicated by a state court." Id. at 254 (internal quotation omitted).

Here, the only remaining claims are under Pennsylvania law. Counts IV through VI, brought under HSCA, involve a significant, unresolved issue properly decided in state court. Central to Trinity's HSCA claim is the issue whether the statute applies retroactively. HSCA was enacted in 1988, but CBI ceased operations at the Site in 1982.

There is currently a divide in the Pennsylvania state courts on the issue of HSCA's retroactivity. In Smith v. Weaver, 665 A.2d 1215 (Pa. Super. 1995), the Superior Court of Pennsylvania determined that HSCA subjects owners or operators of a site to liability, even if the ownership or operation terminated prior to HSCA's enactment. Weaver, 665 A.2d at 1221. Although the court's conclusion in Weaver implies HSCA's retroactivity, the court did not squarely address the issue of retroactivity. The Court of Common Pleas of Jefferson County, Pennsylvania has directly addressed the issue, granting summary judgment on plaintiff's HSCA claim because "[n]owhere in the [HSCA] does the legislature indicate that it was intended to operate retroactively. It thus may not be employed to penalize [defendant] for conduct that occurred years before its enactment." Ingros v. BFG Electroplating & Mfg. Co., 81 Pa. D. & C. 4th 481, 494 (Pa. Com. Pl. 2006).

Federal courts addressing the issue of HSCA's retroactivity have side-stepped the issue, concluding that HSCA covers

releases of hazardous waste continuing past HSCA's effective date. Pottstown Indus. Complex v. P.T.I. Servs., Inc., Civ. No. 91-5660, 1992 WL 50084, *13 (E.D.Pa. Mar. 10, 1992); Fallowfield Dev. Corp. v. Strunk, Civ. No. 89-8644, 1990 WL 52745, *16-17 (E.D.Pa. April 23, 1990) ("[W]hile not intending to apply HSCA retroactively to past releases, [the General Assembly] did intend HSCA to apply to continuing releases[.]").

Because the issue of HSCA's retroactivity is unsettled, and has been subject to divergent interpretations by Pennsylvania and federal courts, the court will decline to maintain jurisdiction over Trinity's HSCA and other state claims.

While Trinity points out that the parties have expended a great deal of effort litigating their claims in federal court, continuing to pursue their state claims in state court does not mean this time and effort will be wasted. The state court will have the benefit of the facts and legal arguments developed in the federal litigation. And, even if the extent of CBI's HSCA liability were clear as a matter of state law, the factual record on summary judgment does not provide a sufficient basis for the apportionment of liability, and thus a trial would be necessary in any event. Accordingly, the interest of judicial economy is not disserved by declining to maintain jurisdiction over the remaining state claims.

Furthermore, much of the relief Trinity seeks is prospective. As Trinity notes, "shovel in the ground" remediation efforts at the Site have not yet begun, and thus the total cost of remediation is yet to be determined. Any potential delay in apportioning costs that results from a move to resolve contribution and cost recovery issues in state court will not be prejudicial or otherwise harmful to the parties.

The court will therefore decline to maintain supplemental jurisdiction over Trinity's HSCA claims, as well as its claims for contribution, negligence per se, indemnification, and breach of contract. These claims will be dismissed without prejudice to Trinity's right to bring them in state court.

IV.  CONCLUSION

For the foregoing reasons, Trinity's federal claims under CERCLA and RCRA are dismissed. The court declines to exercise supplemental jurisdiction over Trinity's state law claims, and dismisses them without prejudice to those claims being asserted in state court.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRINITY INDUSTRIES, INC. and          )
TRINITY INDUSTRIES RAILCAR            )
CORPORATION,                          )
                  Plaintiffs,         )
       v.                             )    Civil Action No. 08-1709
                                      )
CHICAGO BRIDGE AND IRON,              )
COMPANY,                              )
            Defendant.                )

ORDER

AND NOW, this ____ day of April, 2012, IT IS HEREBY ORDERED
that, Plaintiffs' Motion for Partial Summary Judgment [Doc. No.
54], is DENIED. Defendant's Motion for Summary Judgment [Doc.
No. 56] is GRANTED, WITHOUT PREJUDICE to plaintiffs' right to
assert its state law claims in state court.

BY THE COURT,

_____, C.J.

cc: All Counsel of Record